50 CCPA

**Application of Hideo WATANABE.**

**Patent Appeal No. 6917.**

United States Court of Customs and Patent Appeals.

April 25, 1963.

Robert J. Steinmeyer, Fullerton, Cal. (Louis J. Knobbe, La Habra, Cal., and

Robert C. Sullivan, Washington, D. C., of counsel), for appellant.

Clarence W. Moore, Washington, D. C. (Jere W. Sears, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

SMITH, Judge.

Appellant appeals from an adverse decision of the Board of Appeals which affirmed the examiner's final rejection of claims 1 through 5 and 9 of appellant's application [1] for a patent for an "Electrochemical Electrode". Five other claims were allowed.

The invention disclosed by the applicant relates to an electrode component of a device used in the measurement of electromotive force and to a method of manufacturing the same. Such electrodes are commonly used for measuring the concentration of ions in a solution. This measurement is commonly used to determine the acidity or alkalinity of the solution by measuring the hydrogen ion concentration, more commonly referred to as the pH measurement. These electrode components also have other uses, such as a reference standard in corrosion studies and for direct current conductance measurements.

Appellant points out in his specification that electrodes known in the prior art usually consist of a metal and a salt of the metal that will produce an electromotive force when inserted into a solution of a salt. Such electrode components usually comprise a relatively thin layer of the salt on a supporting surface of the metal and thus provide only a limited bulk of electrochemically active material. The thin layers are particularly susceptible to physical deterioration upon temperature cycling due largely to the different coefficients of expansion of the metal and the salt. The limited active amounts of salt will, in time, go completely into solution, particularly when exposed constantly to fresh solutions, resulting in a useless electrode. Also, the thin salt layers of these conventional electrodes are porous or granular in some degree, and thus pockets or a layer of solution forms adjoining the electrode which does not equilibrate rapidly in ionic composition with the main body of solution. Since fundamentally the developed potential is determined by the concentration of ions directly contacting the metal, this results in slow equilibration of the electrode potential when the composition of the main body of solution is changed, or when the temperature changes.

The advantages of appellant's electrode are stated in his brief as follows:

"Appellant's claimed invention is based upon his discovery that an electrode for measuring electromotive forces may be formed by pressure molding a metal and salt of the metal into a substantially nonporous, coherent unitary body, and that, moreover, such an electrode successfully solves the problems associated with the prior art electrodes. For example, electrodes constructed in accordance with appellant's invention have a response time of *2 to 8 minutes* whereas electrodes constructed in accordance with the prior art have a response time of *20 or more minutes*. Moreover, the electrodes which conform to the teachings of appellant are substantially more rugged and have a much longer life during which they provide consistently accurate information than the prior art type electrodes * *."

The invention is defined in claims 1 through 5 in terms of a method of making a substantially non-porous electrode. Claim 1, illustrative of these method claims, is as follows:

"1. A method of making an electrode component for the measurement of electromotive force, which electrode component includes a metal

1. Ser. No. 718,826, filed March 3, 1958.

and a sparingly soluble salt of the metal, the method comprising: mixing the metal and salt together in powdered form; and pressure molding the resulting mixture into a substantially nonporous, coherent unitary body."

Claim 9 which defines the electrode itself is as follows:

"9. An electrode component formed of a powdered metal and a powdered salt of the metal which will produce an electromotive force when inserted into a solution of salt, the electrode component comprising a mixture of the metal and metal salt compressed into a substantially nonporous integral mass."

The board relied upon the following references in affirming the examiner's rejection of the claims as obvious over the prior art:

Wescott   1,711,462   Apr. 30, 1929
White      2,672,441   Mar. 16, 1954

The patent to Wescott discloses a battery electrode of copper and copper oxide which is formed under hydraulic pressure. Wescott prefers that his electrode have "a porosity, (as determined by the increase in weight upon soaking in water, wiping quickly and weighing) of from 25 per cent to 35 per cent." Wescott states in his specification that:

"The pressure used should be sufficient to flow or 'smear' the copper without substantially displacing the copper oxide, that is to say, without further 'mixing' the copper and copper oxide. *With too much pressure, the plate will become impervious.*" [Emphasis added.]

The patent to White relates to a glass electrode for measuring ion concentrations in solution. The electrode element consists of a bead of silver and silver chloride. This bead is formed by heating a small amount of a paste of silver oxide and silver chlorate. It is conceded by the solicitor in his brief that the resulting bead is probably porous due to the release of oxygen and water vapor during decomposition of the paste when heated.

Claims 1, 2, 5 and 9 were rejected as "unpatentable" over Wescott while claims 3 and 4 were rejected as "unpatentable" over Wescott in view of White. We think the rejection of article claim 9 should be considered separately from the method claims 1, 2 and 5 in disposing of the first issue and we shall so treat it in this opinion.

In the rejection of method claims 1, 2, and 5, the examiner and board relied on the statement by Wescott that too much pressure would make his plate or electrode impervious. It is the board's position that this statement is sufficient teaching to a person of ordinary skill in the art that a non-porous, coherent body may be formed from mixed powdered components of a metal and metal salt. In answer to appellant's argument that Wescott does not desire a non-porous electrode and that such an electrode would be inoperable for Wescott's purposes, the board stated that our decision in In re Application of Nehrenberg, 280 F.2d 161, 47 CCPA 1159, is "directly applicable to the facts of the present case."

In that case, an otherwise anticipatory Binder reference fell purposely short of the recited 0.05 to 0.1% carbon content in a steel composition claimed on appeal. Binder stated that "with a higher carbon content than 0.035%, that is, in the range of carbon content that can be produced practically in the arc furnace without the use of oxygen for refinement, the toughness of the steel is lowered even though the toughening elements aluminum, nickel, and copper are present." With respect to this seeming deficiency, we stated:

"In our opinion, however, Binder's disclosure would suggest to those skilled in the art that a carbon content of 0.05 per cent or more might be used in the steels which he discloses if extreme toughness were not desired and it was desired to avoid the additional expense of using oxy-

gen for refinement. A disclosure of a composition of matter in a reference may be anticipatory even though the reference indicates that such composition is not preferred or even that it is unsatisfactory for the intended purpose. In re Smith, 148 F.2d 351, 32 CCPA 959."

We think the board was correct in its conclusion that Wescott teaches a person of ordinary skill in the art of sintering or forming articles from powdered metals by applying heat and pressure that, with sufficient pressure or heat or both, an electrode formed of the materials contemplated by appellant would be non-porous or impervious. We note that none of the appealed method claims recites any particular requirements as to how much pressure or heat is required to render the resulting electrode impervious, the specification stating merely that "Pressures ranging from 5,000 to 100,-000 pounds per square inch have been used" on mixtures of silver and silver chloride. The specification states that the finished product retains "some porosity at the lower end of this pressure range", but is "substantially nonporous at higher pressures". Thus, appellant's disclosure substantially parallels Wescott's teaching that enough pressure will produce a nonporous body. Had such a process been considered to be unobvious to those skilled in the art of forming articles of powdered metal, it would have been necessary for appellant, in meeting the requirements of 35 U.S.C. § 112 with respect to the process claims, to have more specifically indicated the heat and temperature ranges necessary to form an impervious article.

Claim 2 further limits the "metal and sparingly soluble salt of the metal" to a member selected "from the class consisting of silver and a silver halide, silver and a silver sulfide, and copper and copper sulfide." While the Wescott patent used copper and copper oxide,

there is nothing in appellant's specification to indicate that excess pressure, as stated by Wescott, would not render impervious an electrode formed of any of the combinations of appellant's materials. We therefore conclude that the board was correct both in its reliance on In re Nehrenberg, supra, and in its conclusion that the examiner correctly rejected method claims 1, 2 and 5 as "unpatentable over Wescott."

Method claims 3 and 4, rejected "on Wescott in view of White," require the electrode components to be silver plus a silver halide or silver chloride, respectively. The patent to White, as previously stated, discloses an electrode element consisting of a bead of silver and silver chloride. For the reasons stated in our discussion of the rejection of method claims 1, 2 and 5, we agree with the examiner and board that claims 3 and 4 define a method which would be obvious to a person of ordinary skill in the art, in view of the use of silver and silver chloride in the White patent. We therefore affirm the board's rejection of claims 1 through 5, all the method claims.

Claim 9, which defines the electrode itself, was rejected by the examiner as "unpatentable" over Wescott alone. Appellant points out in his specification that his electrode is superior to those of the prior art in its performance as an electrode for pH measurement. An affidavit by appellant asserts the superior performance of the non-porous electrode over a porous electrode of the same materials in measuring ion concentrations. Exhibit 2 of the affidavit indicates that the response time[2] of appellant's impervious electrodes decreases as density increases. The superiority in response time of the most dense (least porous) electrode over the least dense (most porous) is striking. In the test described in the affidavit, the best or least porous electrode had a response time of 2 min-

---

2. "Response time" is said to be the length of time required by the electrode to reach a stable indication in a second solution when transferred from a stable state in a first solution of different molarity.

utes while the worst or most porous had a response time of 50 minutes.

It is clear to us that such an electrode having such a marked reduction in response time, as shown by the Watanabe affidavit, would have significant advantages in many, if not all, laboratory applications over those of the prior art having a slower response. The board and solicitor do not question these advantages asserted by the affidavit, but rather state that such advantages pertain to the particular use as part of an ion concentration measuring apparatus and that the appealed claims are not limited to such use. The solicitor states in his brief that:

" * * * Certainly, it is well established that the patentability of a claim to a compound or article *per se* cannot be predicated on a new use therefor, In re Thuau, 30 CCPA 979, 135 F.2d 344. * * * "

It is the position of the solicitor, as indicated by the above statement, that the clause "which will produce an electromotive force when inserted into a solution of a salt" contained in claim 9 is merely a statement of intended use which cannot impart patentability to the electrode defined in the claim.

We cannot agree. We think that this limitation was intended and should be interpreted as modifying the word "electrode." Electrodes are of many types, each type having particular physical or chemical properties adapting it for use in a particular installation. Thus a "battery electrode" or an "electrode which will produce an emf in a battery solution" defines a particular electrode adapted for a particular purpose. An "ion concentration electrode" or an "electrode * * * which will produce an electromotive force when inserted into a solution of salt" as called for in claim 9 defines an electrode having particular properties making it adaptable to a particular purpose. Therefore, we think that claim 9 properly defines a *particular type*

*of electrode* which, as shown in the affidavit, has significant advantages over any electrode of the prior art when used for the *particular purpose* for which it is intended.

The Wescott patent, for a battery electrode, gives no indication of the problem of reducing response time in electrodes for pH measurement nor does it suggest appellant's solution to the problem. While Wescott does indicate how a non-porous electrode may be formed, the reference gives no indication that such a non-porous electrode would be superior [3] or that porosity has anything at all to do with response time in a pH measurement electrode. The advantages asserted by appellant's affidavit are unchallenged. Since Wescott gives no indication as to the effect of porosity in such an electrode we think that the new ion concentration measuring electrode defined in claim 9 would be unobvious to a person of ordinary skill in the art in view of the limited teaching of Wescott. We therefore *reverse* the decision of the board as to article claim 9.

In summary, we *affirm* the rejection of method claims 1 through 5 and *reverse* the rejection of claim 9.

Modified.

MARTIN, Judge, with whom WORLEY, Chief Judge, joins (concurring).

I concur with the majority in the affirmance of the board's decision as to claims 1 through 5. I agree with the reversal as to claim 9 but I do so on a different basis than the majority sets forth.

I believe claim 9, drawn to the electrode, patentably distinguishes over the Wescott patent because the electrode of Wescott is composed of a metal and *copper oxide* instead of a metal and *its salt*. I find nothing in the record which demonstrates that a *non-porous* electrode of Wescott's materials will provide the unexpected advantages of reaching equi-

---

3. Wescott indicates that a "good [battery] plate made under the present invention" should have a *porosity* of from 25 to 35 per cent.

librium in a shorter time than any other prior art electrode in the measurement of ion concentration as does appellant's electrode. Thus it is evident that the electrode of claim 9 is distinguished from Wescott in the use of a *metal salt* instead of *copper oxide* in its construction, thereby producing the stated unexpected results.